to the related or arguably tandem cases of Jacobson v. Bassett and Roberts et al. v. Good morning, Your Honor. May it please the Court. Plaintiff is challenging a policy that, on its face, sets different criteria for access to life-saving medicines based on the race of the patient. And, of course, the District Court only dismissed the case for lack of standing, but we think that was wrong several times over. So we believe Northeastern Florida Chapter of General Contractors effectively begins and ends the standing inquiry. The Supreme Court's holding is unequivocal. When the government erects a barrier that makes it more difficult for members of one group to obtain a benefit than members of another group, a member of the former group seeking to challenge the barrier need not allege he would have obtained the benefit but for the barrier to have standing. The injury is the denial of equal treatment. It's not the ultimate outcome. Well, the question in these cases that you cite, both the admissions cases and the contractor cases, are whether the contractor would have to show, for example, I would have been the preferred contractor if there were not a racial set-aside, which would be a very demanding thing to prove, obviously. But he does have to show that he's a contractor who would have applied, that he is qualified to do the work, that he's eligible for the contract. And the same with the admissions cases. The person who says I was discriminated against doesn't have to show if there were no racial set-aside, I would somehow have prevailed. And schools that purport to do some kind of holistic balancing, I'm not sure you'd ever show that. He just has to show I was an applicant, or even I was going to be an applicant. I want to go to law school. If you were already a lawyer, you probably couldn't challenge the law school admissions thing, right? So it's not just that any white person could challenge the University of Texas Affirmative Action Law School Admission Program. They'd have to be somebody who's plausibly going to apply for the benefit, right? Of course. And obviously, the COVID pandemic with infection rates and need for treatment is obviously a more widespread type of injury than that. But I think in this scenario, he would have to show simply that he is at risk of getting COVID, which I think it's accepted fact that we all are and that at some point he may need treatment. And that's that's it. And then we believe there's a barrier. And it's really any person could. There's no particularized injury here, really. Any person who is not within the categories of preference could have brought this lawsuit. Well, Your Honor, I think the cases are actually clear that just because an injury is widespread doesn't destroy your standing. I think the Bauer case is a classic example of that. In Bauer, the plaintiff alleged that the USDA needed to be regulating beef more aggressively to prevent mad cow disease. There had never been a single case of mad cow disease found in the United States. And this court still held that that increased risk of harm to him was enough to give rise to standing, even though conceivably any person who ate beef in the United States would have had the same type of injury. So, again, I think that was an important distinction. Right. Any person who ate beef. So he did need to allege that he ate beef and continued intended to continue eating beef. I'm struggling with trying to figure out the analogy. And I know it's just there's not a perfect one. Nobody intends to get COVID. But is there. I guess you're not looking for a limiting principle. You want to say any person can bring this suit. Any white person can bring this suit. No, well, you would still have to allege some risk. And again, it is a widespread injury. But again, I think Bauer and the Supreme Court said explicitly that just because it's widespread. Now, again, it can't be a. Well, you just said. You actually answered my question by saying we all could get COVID. So, of course, anybody now, of course, anybody who's black or in one of the other protected categories under these regulations couldn't bring it. But any white person could bring it. Anyone who. And again, he still has to allege. So, for example, Mr. Jacobson said his affidavit. And in the complaint that he teaches in person at Cornell, which has had it's a university. And despite vaccine mask mandates, has had severe outbreaks. And so there's no question he's in the class of persons that, assuming as we must at the pleading stage, this is a barrier that he would be affected by this barrier and incur the equal treatment injury that the court talked about in Northeastern general contractors. If I may respond directly to New York's point, because the district court here didn't address this notion that the policy is just voluntary or non-binding. And the most fundamental problem with this argument is that we see all the time documents that government agencies issue that say this is a guidance. This is a recommendation. This is an advisory. This is a FYI bulletin. But none of that is present here. There are none of the sorts of disclaimers or caveats or qualifications that you would see in something that's a truly advisory document. And in fact, it's on formal letterhead. It has the governor and commissioner's name. And we cite it in our brief. There's a statute in New York that says disobeying a Department of Public Health order can result in civil penalties and fines. And so I don't think a doctor that received this extremely formal looking memo would think it was anything other than a directive. And it uses words like adhere, prioritize, prioritization. These are not words of advice and suggestion and recommendation. These are words of mandates and regulations and binding obligations. And so how exactly in your view would this system work, the system that you find offensive? How would it work? What's the system of classification? Yes. So the way the thing to answer the question directly. So there's a little there's a checklist of things you need to receive oral antiviral. So there's some that are obviously not in dispute. You have to be 12 or older, a certain weight, test positive, have mild to moderate, not severe. But then it says have a medical condition or other factors that increase risk for severe illness. If you are of a nonwhite or Hispanic Latino ethnicity, automatic qualification with nothing further. But otherwise, you would have to show affirmatively this medical condition or other factors. So I think it's basically saying certain groups of people based on race get automatically satisfy this. It's arguably an irrational classification in itself. I'm sorry, Your Honor? It's arguably an irrational classification in itself. I mean, Hispanic covers a lot of ground. We would agree with that, Your Honor. From Bernardo Higgins to Bernita Juarez. We would completely agree with that. And in fact, of course, if we got to the merits, one key aspect of strict scrutiny is narrow tailoring. And for example, Asian-Americans who presumably would be lumped in with nonwhite or nonwhite do way better than white citizens on measures of COVID hospitalization deaths. And so this is not even close to narrowly tailored if we got to the merits here. And do we know anything about how this system of classification was created? I don't have that on the record, Your Honor. I'm not sure it's relevant at this point, but I'm just wondering how it came to exist. We weren't aware. I do think it's notable that two other states, I believe Minnesota and Utah, initially put out something that looked very similar and then immediately rescinded it.  They say, here are the objective medical criteria that physicians should look at in prescribing oral antivirals in times of shortage. And they're race neutral, and everyone is treated equally. And again, we would say, if we were able to litigate this on the merits, that strict scrutiny is a very tough standard. And the burden would be considerable on the state to show tailoring. But those are the merits. Yes, of course. One thing I'm interested in at this point is how was this supposed to work? How did this work in terms of actual distribution? Because these are guidelines that should – the whole system is only implemented when logistical or supply constraints make it impossible to offer the therapy to all eligible patients. So where and when did that ever happen? I don't have that in this record, Your Honor. Is there any indication that it ever happened? That is to say that a provider – and I take it we have to be at the level of a doctor, right? I'm not sure. How is a doctor supposed to decide whether there is a supply shortage such that it is impossible to offer this therapy to everyone? Here's a patient who is suffering. The doctor thinks that Paxlovid will do that patient good. What is the doctor supposed to do? I don't have that on this record other than to say I do think it is undisputed that there was absolutely a time when there were real shortages. There may have been shortages, but the shortages, I take it, are nationwide. We've got all these people getting COVID. Nationwide, we've just approved this drug and there's not a lot of supply. Within a matter of weeks, right, there was enough. So during that period of the weeks, I'm a doctor in whatever, some small town in New York. I've got this patient, happens to be white. I don't have any other patients that have COVID. White, black, old, young, whatever. This is the guy that I'm prescribing for at this moment. Am I not allowed to write a prescription for that person? It sounds like the one thing that's crystal clear is that under this document in JA-20, the doctor would have to do a more searching inquiry for the white patient than for a patient of another race. Why is there a searching inquiry? The question is, I call up Charlie Dock down at the pharmacist and he says, yeah, I got some pills. Is there a run on them? Is there a million people down there now? There's nobody here at the moment. Why can't the doctor prescribe the drug? In that situation, it sounds like they could, but again, I'd also reiterate that. Does the doctor have to call the pharmacist first? Does it say anywhere that you have to check and see? Or is it the fault of the pharmacist then at some point? Okay, now a different scenario where I think you might have an issue. We're at a hospital. They've got their own pharmacy. They've got their own supplies. I understand with respect to, for example, ventilators. They were making literal life and death triage decisions every day because there are only X ventilators and there are two X patients who, at least in principle, could benefit from the ventilator. Now we're in real up against it. Is there any allegation that there was any hospital ever anywhere in New York State that had not enough Pax Lovid to go around and had to apply these guidelines? I'm not aware of that on this record. So this is why I wonder. We're talking about, as we often are in these standing situations, very distinct situations. I got in trouble with the Supreme Court once for over-reading Bauer or for relying on Bauer in a case they didn't think it was similar. We look at the particular circumstances, and you're asking us to invalidate a policy that was probably in effect in some way for a period of a certain number of weeks in early 2020 without any evidence that it ever actually got applied to anyone at all. Well, maybe the best way to answer that is if it was completely irrelevant, it seems unlikely they would have issued it. The Department of Health must have thought that there would be these situations where doctors would have to be prescribing based on scarcity criteria or else this whole exercise would have been pointless. And I don't know why we would have needed this in the first place. And so I don't want to ask questions of either side. I mean, I take it they're saying we've got to be prepared. We've got triage problems here. We've just lived through – we are living through the thing with the ventilators, and now we've got this new drug, and we don't know how many pills are going to be there. I'm sure they thought it mattered. But now we're being asked years after the fact – and I understand I'm not getting into the technicalities of mootness either. We're being asked to adjudicate the constitutionality of something that they did in an emergency that, for all we know, didn't actually affect any single human being, let alone your client. Well, again, when you – under northeastern Florida contractors, it is the – all you need to plead is that this thing you're challenging might make it more difficult. Was there any dispute but that the policy was – we had contracts for construction. Some of them were set aside for minorities. People who were white who were contractors knew that they're not eligible for a certain percentage of these contracts that actually exist, and that goes on indefinitely into the future. That's a very different situation, it seems to me. You're relying – you're doing what lawyers do all the time. You're picking a line out of the case that says this is the standard, and now we've got to apply that standard from this case to a case that's actually quite different. Well, it looks more similar to Grutter, though, where – or, I guess, Grath – or, yes, Grutter, where it claimed to be a holistic race is considered at some points and others. And that sort of looks like this also. And you needed to be an applicant, and the person who applied was an applicant. You needed to be an applicant, but you also – I'm struggling with trying to make analogies work here to the existing cases that we have. And in the contractor's case, to make it analogous, you'd have to say under the following set of circumstances which may or may not come to pass, and we will set aside. But we don't know yet – we're not at the point where those circumstances have come to pass and the set aside is actually coming into play. There's an intermediate set of contingencies, and is that just an empirical evaluation of how likely they are to come to pass, or is the mere possibility enough to get your – I think Bauer gets us there, and I think COVID is different. I mean, my friends cite the MGM case heavily, but that's a classic example where it was a challenge to a Connecticut casino law that set aside – or gave some preferences to Indian tribes. And it was held that MGM had no plans whatsoever to actually build a casino in Connecticut. And so, fine, no standing. They couldn't say we faced a hostile business climate because of the law. But with COVID, again – and we said, again, it's outside the record, but Jacobson did in fact get COVID, as virtually all of us have at some point, and this is not a speculative possibility. In Bauer, what was interesting to me is a fairly robust discussion between the majority and the dissent about data and likelihood and other things. And so I guess I'm wondering whether that signals the framework that we ought to be doing not just a, oh, it's possible, therefore they're standing, but exploring the data to try to figure out the likelihood. And I think that's a great point, because I think when you look at the state's arguments, they look a lot like Judge Pooler's dissent in Bauer, which of course is a dissent that said this is all too speculative. We have no idea if he's going to eat mad cow – buy beef that has mad cow and get sick. And so, again, we think with Bauer on the books, combined with northeastern Florida general contractors, we think that gets us all the way to standing here. And we'd urge the court to reverse. Thanks very much. Do we have the same counsel arguing both of these cases, or are we going to have other counsel? Different counsel, Your Honor. That's fine. May it please the court, Beasley Kiernan for Commissioner Bassett. The district court correctly dismissed the Jacobson complaint for lack of standing, and this court should affirm. Plaintiff lacks standing because he has failed to allege any actual or imminent, any concrete or particularized injury. Instead, he relies on a chain, an attenuated chain of possibilities which have not yet come to pass, chief among which there is no shortage of oral antivirals. On its face, the guidance's prioritization framework, which is only suggestion, it applies only during times of shortage. Okay, but there will be, right? Every time there's a new vaccine, every time there's a new antiviral, there's a period in which it exists in less than sufficient quantities to address the whole population. I mean, are we really going to ignore the ebbs and flows of COVID in looking at the data here? It's possible that there may be a shortage of Paxlovid and Molnupiravir, the two antivirals. There was a very, very significant shortage in December of last year, right when these drugs were authorized. It coincided with the peak of the Omicron wave. If there is another shortage of Paxlovid, there'll be plenty of warning. We'll see a variant coming. We'll see supply issues arising. But there's no reasonable expectation of a shortage at this point. So this policy wouldn't apply to new antivirals? It only applies to the past ones? If there were new antivirals on the market, I would expect DOH to issue new guidance about those antivirals, absolutely. Well, that goes back to another question. So these guidances, and there are two, you're representing the state or you're also representing the city for this purpose today? I'm representing the state. The city has separate counsel. Okay, but they're not here to argue on this case? Not on this case. Okay. But these policies, have they been revoked? No, right? The policies have not been formally withdrawn, no. They still exist, but there seems to be no real factual dispute that at this moment they have no application to anything. That's right. And so, again, going just to make sure I understand your answer to Judge Robinson's question. But these are not general triage policies for all what are called under something called the PREP Act, under federal law, countermeasures. This is about these specific drugs? That's correct. And you're suggesting there is little prospect of a shortage suddenly coming upon us with respect to these drugs? At this point, there's no expectation of a shortage. But if there is a shortage, your view is that the state has effectively stated its intentions to distribute and on how it will distribute medications. Is that right? Well, the state is not distributing antivirals in the same way that it distributed the vaccines, for example. The state did control distribution of the vaccines. Here, any pharmacy can request Pax Lovett and Molnupiravir, is my understanding. Why this provision or this advice, whatever? Well, how would you characterize the race question in these cases? It is advisory. It advises physicians as to the eligibility criteria. Based on race, in part. Based on evidence that nonwhite race, Hispanic ethnicity are risk factors for severe disease and the CDC's recommendation to consider race and ethnicity as well. Yes. The guidance was just that. A little unusual, isn't it? In the health field, I would have thought. I mean, you're not troubled in any way by this? I don't want to. Let me put it to you in the most direct, obvious sense. I come from a part of the world in which so-called Hispanics or Latinos come in every variety, including what you might regard as Chinese. To take a simple example, the great Cuban patriots of the 19th and early 20th century have the distinction of being what you might call white and others may call, in the case of Antonio Maceo, famously black. And a third great figure who was mixed race. How would they fit into this topology? First of all, this is non-binding guidance. So why is it there at all if it's not binding? It's to advise physicians of evidence that nonwhite race and Hispanic ethnicity, in the United States at least, do... their health situation different from that of other people. Well, at this point, as time passes, the scientific community absolutely may be able to discern underlying factors. And those factors may take the place of race and ethnicity. But at this point, the evidence in the record suggests that even controlling... Well, the evidence in the record is that this is the intention of this particular agency, right? Of the New York State Department of Health. This is the guidance that they're interested in. How could you not imagine that that will be their advice if the situation were the same again? If there were a supply shortage, I would expect DOH to issue supplemental advice. Just as in March of this year, DOH stated that there is no shortage. Physicians should consider all treatment options. If there is a shortage in the future, it may very well be the case that this framework continues to be the recommendation of DOH, or DOH may take that. I think it's not so unusual that there are ethnic factors in connection with certain diseases, right? Tay-Sachs disease, I understand, is more prevalent among Ashkenazi Jews than among other people. Sickle cell anemia is more common, significantly, hugely more common among people of African descent, right? And I don't know whether there ever has been or would be a shortage of supply of tests for these things. But even some of these tests are intrusive, maybe even dangerous to perform. It would not surprise me if there were guidance of some kind, either from the government or from experts, saying the standard of medical practice is you don't test for Tay-Sachs on every pregnant person. Anybody who has certain symptoms that might be consistent with sickle cell anemia, you don't do a test for that unless the person is some African ancestry, because it's too risky, too expensive, maybe there's even a shortage. But all that goes to the merits of is this unusual and what kind of science do you need, and why are we even – what's the prior question when you're doing the research? Why do you put a category of Hispanic rather than something more nuanced? And then you find out that the people who fall into this category of Hispanic, however artificial it may be, maybe just by self-designation, wind up having worse outcomes than people who don't. By self-designation, you have worse outcomes. The underlying science could be weird, too. Can I follow up on that? Because I think you said something a second ago that they may be able to isolate the variables, suggesting that this categorization is a stand-in for other factors. And at least as I read the AMA brief, there's extensive evidence that the fact of belonging to these categories in and of itself is an independent factor that points in the direction of worse outcomes, so that you have two people, for instance, both have diabetes. The data tells us that the African American with diabetes is at significantly higher risk for worse outcomes, even though they're both in the same box. And I guess I'm just wondering whether you adopt the sort of medical reasoning that we see in the AMA brief or whether you take a narrower view that in this construct race is a stand-in for something unidentifiable. Well, first I just want to make clear the reason we're considering risk here is because Paxlovi and Malnupiravir are only approved for those at high risk of severe COVID-19. Generally, you're not considering risk factors for whether you're prescribing medications, but here you do have to consider risk factors. Absolutely, the AMCAS brief makes very clear why some of these inequities are there. For example, African Americans and Hispanics experience higher rates of undiagnosed medical conditions. Of course, the AMA would say they're not inequities. They would say that they're medically driven standards to create equity. Sure, absolutely. Longstanding stress, for example, contributes to poor health outcomes and to the extent racism causes stress. That's another reason why non-white and Hispanic people might experience a higher risk of severe disease from COVID-19. But what you're suggesting, it seems to me, and let me see if I can clarify this, what you're saying. One answer is we don't really know. That is, based on the research that's been done to date, when you factor in all of the other things that we already are factoring here and control for those, outcomes are worse for people who are classified in the study by whatever means as black or Hispanic, even after you control for all of those. But, of course, you can never control for everything. So I suppose as science marches on, you could do studies of only African Americans and then try to figure out, well, let's just try gum disease. I mean, that has been linked to heart failure, so maybe it's linked to bad COVID outcomes. And lo and behold, it does. And it explains all the variation that if you're black but have never had gum disease, you're equivalent functionally to somebody who's not black. But if you did have gum disease, and then we test that on whites, it turns out that actually for whites, too, this is a factor. And so now we have a race-neutral factor that would explain everything. But that's just a function of how much science we've got at any given moment to figure out what the – we have a hypothesis about stress or whatever. Maybe we haven't tested yet, really, to see whether minority folks in low-stress occupations and whatever with relatively lower stress than most other people, even taking racism into account, turn out okay. And we could, you know, quantify the stress. But all that is a question – an empirical question based on what goes on. And all of that is empirical questions, it seems to me, that go to the merits and not to the standing problem. That's – of course. And if the court does find standing and that the case is not moot, the court should remand so that the district court may address the preliminary injunction motion in the first instance. But if I may answer your question briefly on the merits, this is still a very new disease. It's only a few years old. And racial disparities do persist, even when controlling for comorbidities. That evidence is in the record. For example, 184 of the Jacobson Joint Appendix shows that Native Americans, Black Americans, and Asian Americans faced longer hospital stays and a higher likelihood of ventilator dependence. Page 195 of the Joint Appendix suggests that nonwhite people experienced higher mortality rates, even controlling for educational attainment. Again, all that goes to the merits. But I urge your honors to affirm for lack of standing because Plaintiff has failed to show any actual or imminent injury that is traceable to DOH and redressable by a declaration that the guidance is unconstitutional. Thank you. Thank you very much. We reserve decision. And you're up again. Just a couple quick points. I'll be very brief. So Judge Robinson, on this question of there's no shortage. Now, JA 45, their own witness says supply chain disruptions can happen at any time. We've all known this over the last few years, that as things spike and supply shocks happen, that that's obviously not speculative that that could happen again. The policy is absolutely in effect. And the department has never argued otherwise. And now on this question. Well, how do we know that it's in effect? Well, they have not rescinded it. And the item attached to their brief in this court, that suspends it. It says there is no shortage. But that document remains what will happen if there is a shortage. Now, on the gross disparities, it is, we see from the Supreme Court again and again, it is very dangerous to be giving out benefits or burdens based on people's race. But this is the merits. Do you really think we're going to issue a preliminary injunction on our own authority based on our own assessment of the merits that have never been assessed by any district judge? We're really focused here on, and it's a very, you know, that's got its own set of problems. It's hard enough to deal with the standing, frankly, and mootness issues because, you know, for example, one question here that's been asserted, and maybe you agree with this, is that this guidance is about Pax Lovett and one other drug. There is no shortage now, but hypothetically there could be. Is that basically your position? Are you arguing that it's not just that, but the next new drug to come along, they're going to issue the same guidance? You're not arguing that that would give you standing, right? We haven't raised anything like that. We're focused on this guidance about these drugs, and you are saying that it's still in effect, and there's certainly no guarantee that there won't be shortages in the future. Yes. And so the question is how speculative is speculative, how concrete is concrete, at least as we look forward. Then let me, if the last thing I could say is to answer Judge Koubranis' question, why is this there at all if it is voluntary? What they could have done, if there are these disparities that the AMA and the EPILES and others acknowledge, publish them, talk about them, tell doctors to be really careful to make sure that as you're treating people for COVID, you're treating people fairly based on race. That's the way you educate and you address this, and you do it in a race-neutral way that doesn't involve a policy that on its face appears to tell doctors to give. I'm sorry, but what if they think this is the best policy? I mean, you're saying they should have said take this into account, be careful about this, but of course that's sort of like these non-quota affirmative action things, isn't it? Wouldn't the logic of your position be they shouldn't say that? They shouldn't say be more careful, be more worried when you're dealing with someone who's African-American. I think there is a meaningful difference, and again, not to get into merits, but just to respond to the question. I do think there's a meaningful difference between saying make sure you treat everyone fairly and equally versus criteria that say prioritize in this way and race is the first one. I'm just focused on the question of you said why would they give this guidance if it weren't sort of mandatory, but then you said they should have given some other kind of guidance which also wouldn't have been mandatory. I'm not sure what the difference is. If the question is is it mandatory or not, what's the difference between saying before you give Pax Lovett out to anybody, read this article by Drs. Jones, Schwartz, and Simpson that happens to be an article that says we've got way worse outcomes for minority people. That would be okay, but summarizing the results and saying we really should prioritize these people is different. Education publication is a meaningful difference than what this says is prioritization. Well, but it's still what they're saying is how we think you should prioritize, and I'm just having a little trouble saying why is that so quasi-mandatory as opposed to an educational program that is labeled an educational program that basically says the same thing by dint of pointing to this article and that article. I don't think anyone, Your Honor, would think that that carried the force of law, and I think virtually anyone who saw the documented issue here would think it did. And to get back to the question of how this operationalizes, who is bound to do what when facing your client? If your client came down with COVID not in Massachusetts but in New York, and it was during a period when there was still a perceived shortage, and he walks into the doctor's office, is the doctor required slash forbidden to do what? They seem to envision a fairly reticulated process that includes race at every step. In the second document, the one from December 29th, it even talks about counting up the risk factors, and, of course, race is a risk factor, which means that there would always be. But the question is, this is a triage document. How does the doctor know whether he or she is in a triage situation other than that nationwide probably somebody is? But if I can write a prescription for my patient, or if I as the pharmacist can say, I got five doses of this stuff here, you're the first guy to come in. Thanks very much. We're going to hear counsel in Roberts against Bassett, 22-622. Yes, thank you. Mr. Fong? You're up. Thank you. Thank you, Your Honor, and may it please the court. When fought for plaintiffs Jonathan Roberts and Charles Arushka, who are here with us in the courtroom today. Plaintiffs seek equal access to potentially life-saving COVID-19 treatments, but New York City believes that a race-neutral system for distributing COVID treatments would be tantamount to racial discrimination. In December, the city directed medical professionals to follow the state's directives and to use race as a factor in allocating treatments. The plaintiffs in this case, like the plaintiff in the last case, have standing to challenge the state's directives. But unlike the plaintiff in the last case, the plaintiffs here are lifelong New York City residents, so they also have standing to challenge the city's directive and a viable claim against the city for nominal damages. Plaintiffs here are therefore entitled both to prospective and retrospective relief. They are entitled to prospective relief because the state represents the challenge directive has not been superseded and acknowledges that supply shortages can occur at any time. Why do you claim, as I think you do, that there's a reasonable expectation, quote unquote, that the guidance will once again come into effect? Well, I think I claim that we claim that because of what the state has said in their declarations, that the directive has not been superseded, that the supply shortages can happen at any time. If you think about- was sort of a reasonable expectation that it would. Or do you think that's not the standard? Do you think the standard is, as you sort of just phrased it, if it is possible that at some point in the future supply chains could break down or there could be another temporary shortage? If that is a possibility, is that enough for standing? Is that your position? Well, it's not merely possible, Your Honor. I think it is a reasonable expectation because we're talking about COVID here. So it's a reasonable expectation that it will happen, that there will be a shortage of Pax Lovit in the future. Sure, Your Honor, and I think we have much more of a reasonable expectation in this case compared to the plaintiff in Bauer that he would contract, you know, mad cow disease. Here we're talking about the coronavirus pandemic we've seen in the past two years. Unexpected, unforeseen variants, unforeseen supply shortages, unforeseen lockdowns. If we're talking about the injury being an exposure to a risk, which is, I gather, your contention, the plaintiff in Bauer, there's a very high likelihood that he will consume meat, which is what he contends creates the exposure to the risk. Here, what creates the exposure to the risk is a combination of shortages in drugs that are now plentiful on the market in the particular place where an individual, where one of your clients then also gets sick and is deprived of the medication on account of, well, they have to get sick, and therefore they're competing on an unlevel playing field. But there is this intermediary contingency that doesn't exist in Bauer.  So I don't think there is, Your Honor, because in Bauer, I mean, Your Honor asked about the number of people who could be affected and who have standing, and I think the number of, you know, white residents who are otherwise eligible for these treatments, that pales in comparison to the number of plaintiffs, possible plaintiffs in Bauer, which is meat eaters, American meat eaters. And I think the fact that there are many people withstanding here goes to the fact that this is COVID, which, as we've learned in the last two years, can affect millions of people at once. But you also need the shortage, right? So even if we grant you that COVID can affect everyone, the policy doesn't come into play until you also have a shortage. What's the analogy to that in the Bauer case? So we do need a shortage, and I think the proper analogy, you know, you can talk about Bauer, you can also talk about cases like the Jacksonville, City of Jacksonville case, Associated General Contractors case, where, you know, the court didn't really look at this particular contract or that particular contract that was going to be bid on. It just looked at overall there were going to be contracts with racial preferences, and those preferences put the plaintiffs there and its members at an unequal playing field. But it was certain there would be contracts. Sure, and I would say here the state itself expects there to be shortages. No, no, no. What you quoted the state as saying, now I'm not sure, maybe this was your misspeaking, was there is a possibility. There is always a possibility is what you quoted them as saying. Now maybe they said something stronger, but there's always a possibility that we could be invaded by space aliens. It could happen. We don't know. We don't know whether there are space aliens or there aren't. It's possible. Now, I grant you that's outlandish. This is probably not outlandish, but the question of how likely does it need to be on a going forward basis. I mean, more likely than that Mr. Lyons might have another encounter with the police where they used a chokehold? Your Honor, in Lyons there was no official policy. Here there was an official policy from the state side and the city side. Right, so we're predicting what's going to happen. I don't think that we need to make any more of a prediction in this case than courts in the education admissions cases where there's no guarantee that race will be a factor with regard to any particular applicant. But regardless, because race is used in admissions decisions, those cases, regardless of the merits, they've come out different ways on the merits. But you still have to be an applicant, and there are lots of people who are applicants, and there are many people who aren't. But what we're talking about here, it seems to me, is something that does feel very speculative if what we're saying, at least on the future look, there's a different question with respect to what happened in the past, but with respect to the future and injunctive relief, how likely does it need to be that there will be shortages of these particular drugs in the future in order for you to have standing? What is your view of it? Because I don't know if there's a clear – what is even the formulation? Reasonable likelihood, reasonable certainty, probability, some likelihood, near possibility? What is it? So I think we have claims for retrospective and prospective relief here. I'm asking about the prospective for now. Right, Your Honor. So for prospective relief, I think it has to be a reasonable likelihood, and I think what your question gets at with sort of the applications in the education admissions cases is this line that the Supreme Court has drawn about individuals who are willing and able to compete for the benefit. So of course – No, no, but we're talking about the likelihood of the shortage here. Right. And so the question is what – I'm just trying to figure out. You said, okay, reasonable likelihood. Is that something that they admitted, or is there some expert on your side that says there is a reasonable likelihood? If that's the standard, I don't know if it is, but that's the language you picked of the range for now. Is there somebody who says reasonable likelihood? Well, this was dismissed at the pleading stage, so we don't have experts in this case, but I think you would get the reasonable likelihood. What is the allegation? The allegation is that COVID is an unpredictable pandemic. Supply shortages, supply chain disruptions can occur at any time, and the government itself – And the government itself says what about – The government itself acknowledges all of those facts and has not rescinded the prior directive in response to direct questioning from the district court, and if the government didn't expect the shortages to occur in the future, I think it raises a question about why it didn't do that. Why not rescind it? Correct, Your Honor. Thank you. I'll reserve my time. Thank you. Thank you, Your Honors. May it please the court, you're getting the state again, and then you'll get the city. This is Andrea Trento from the Office of the Attorney General. Well, Mr. Trento, why don't we pick up right where we left off. Yes. Why do these things still exist if there's no reasonable likelihood that this is ever going to happen again? Why not wait until it does and then see whether at that time the science is different or better and issue new guidance? Well, the guidance itself has been – it is not being applied for that very reason, Your Honor. There is no shortage right now. There's no expectation that there will be a shortage. No one is predicting that there will be a shortage. Of course it's always possible that there's a shortage, but the guidance – that aspect of the guidance that directs prioritization in times of shortage is just not being applied on its face. Well, let's go back to this question of why it's still there. Why create undue anxiety among members of the community, substantial numbers of persons in the community, by having that there, this provision, which appears to suggest the distribution of medicines of some kind on the basis of race? Well, it was there, Your Honor, because there was a shortage. And so – We understand that. Yeah. So you say there's no shortage now. Correct. So you're prepared to rescind this guidance? Well, the guidance hasn't been rescinded. I can't speak to what the department – what was going through the mind of the department when it made a determination whether to update it as opposed to rescind it. But I suspect – well, I don't know what the answer to that is, Your Honor. I know that what the department did was make an announcement that that aspect of the guidance that says this prioritization is to be applied in times of shortage or supply chain limitations is no longer in effect. The physicians are encouraged to explore all treatment options as early as possible. Can we go back then? Mr. Fott didn't get to it, but he did make the point that he's challenging not only going forward, standing to get injunctive relief perhaps. He's also raising the question of standing for some form of retrospective relief. And you just said, well, this was in effect for a period of time. Now, I take it none of the plaintiffs are able to establish physical damages because they either never got COVID or they got drugs or whatever. No one's saying that – no plaintiff is saying that he or she got – was denied the drugs. But I'm sure Mr. Fott would suggest that nominal damages could apply if this policy was in effect and was illegal, even if no one has found a plaintiff who could actually claim to have been physically harmed by it. So what's wrong with that theory of standing, at least looking retrospectively? Well, Commissioner Bassett has been sued only in her official capacity as an officer of the state. And so any claim for damages against Commissioner Bassett, nominal or otherwise, is barred by sovereign immunity. And so the court lacks jurisdiction over that claim for that reason, for that independent reason. And so with regard to nominal damages, that is just not something, with regard to the state at least, that the court really needs to trouble. So they were only suing – well, I guess we'll have to hear from the city then is what you're saying. I can't speak for the city. They may have a problem, but you don't on nominal damages. Is that the position? That's correct. We'll hear from them. If I could address the question that Your Honor has raised about how to try to tie Bauer, analogize Bauer to this case, given the fact that we're not in a supply chain shortage right now. And I think – I mean, this is a thought experiment, so I don't know that – it requires a little bit of creativity. But I think it would be as if in Bauer the prospect of mad cow disease would suddenly not – no longer be extant. It's no longer the case that this disease is circulating among the cows in England or wherever. It may come back, but we don't know. For now it's not. And so that would be the analogous situation. You'd have a plaintiff suing on a hypothetical, maybe this will one day return again. I may one day again be exposed to this disease by consuming this meat, but he's not right now. And that's the case we have here. So unless the court has any further questions. Thank you. Thank you. Sorry. Always happens to me. Good afternoon, Your Honors. May it please the court. Diana Lawless on behalf of the city. So I just want to make sure Your Honors are aware of what the city did here. So the city's advisory is on JA 4242. The city advised clinicians to adhere to the state's guidance on prioritization during the time of severe resource limitations and should consider race and ethnicity when assessing a risk among those things. So I think when it comes to standing with respect to the city, I know, Your Honor, Judge Lynch, you wanted to talk about nominal damages. I think that any claim here of concrete unparticulized injury is still speculation piled upon speculation. I think the Supreme Court has said recently in the Yuseg Gabam case, nominal damages have to be for redress for a completed violation of a legal right. I think that they would have had to have suffered some sort of damage. They would have had to have contracted COVID during the shortage period for liability to attach. And I also think that applies to prospective relief because I struggle, as Your Honors have struggled, with the application of the barrier test in the city of Jacksonville test. And there, as Your Honors have discussed, the contractors were ready and able to bid on contracts. The contracts were always going to exist. There was a city policy that created the barrier to the access to the contracts. Here there's plenty of factors that were beyond the city's control to prevent the plaintiffs from identifying any injury. I think any barrier case, every barrier case the Supreme Court has found, has had a centralized and binding government contract, government process. Here this is a decentralized process. There's innumerable health care providers, mostly private actors. The city advisory is non-binding, and we put in, Judge Cabranes, you may be interested in looking at this about why we did this. The Morse Affidavit from our chief health officer, she explained that we did it. to follow not only the state guidance, but also to raise awareness that this could be a factor. It's not a mandate. The city would not have taken any enforcement actions against anyone for not following it. The city had no way of tracking anything. There's no matrix. There's no point system. All it says is, among other factors, one should consider race and ethnicity. In fact, hearing from plaintiff's counsel in the other case, the Jacobson's case, when he's saying this is an FYI bulletin, and everything he said on reply in his rebuttal argument about, well, you know, if they had just said consider this as a factor, I think that's what the city's policy did here. Well, but the city's policy uses imperative words. It says adhere to New York State policies. It later says on page appendix 41, supplies will be initially be extremely limited. While supplies remain low, adhere to the New York State Department of Health guidelines. Later it says eligibility, oral antiviral treatment is authorized for patients who meet all the following criteria. And then one of them is have a medical condition or other factors that increase their risk for severe COVID. Consider race and ethnicity when assessing. These sound like requirements, whether there's a penalty for it. And maybe the city oversteps. Maybe it's not entitled to tell doctors what to do. But it sounds like you're telling doctors what to do. Well, we're advising doctors, right? These are health advisories that get sent to a number of health care providers. They're posted on the city's health department's website. Adhere to the state's policy. I guess then we piggyback on all the arguments that the state says about how this is not, this is advisory. And then also what your honor quoted about, here's the criteria. Those were from the FDA criteria from the emergency use authorization. So we're not saying do anything other than, you know, this is the information that's out here. Does your department have any regulatory authority over doctors? There's regulatory authority over doctors that I personally, for the purpose of this case, I'm not aware of the extent of it. But for the purpose of this policy, it's really a health advisory. It's something called a health advisory. They just distribute via e-mail and then it's posted on our website. For this purpose, it's undisputed that we weren't going to do anything with respect to anyone. With respect to how these medications were going to be distributed. Well, when you say you weren't going to, there's, you know, it's fine to say after the fact, we were determined to use our prosecutorial discretion not to do anything. But if you had issued a criminal law that says you're in violation of law if you do X, nobody has any way of knowing that. So I'm still interested in the question of what is the regulatory authority, if any. I mean, suppose you had something that, you know, there were mandatory things, mask mandates, for example. If you issued a mask mandate and people defied it, what could theoretically happen to them? Well, I have to say that I personally am not very well aware of the framework as to what happens. But I know that the health department is allowed to issue regulations, is allowed to have anything that's enforceable. What this is- Perhaps counsel for the city and the state would do us the service of sending us a letter, a short letter, pointing out whatever authority this department may have over physicians or other health providers. Sure. It would be helpful, I think. Thank you, Ron. I always understand. We will do that. Thanks very much. But I will say also to continue the test for standing, even if there could have been anything that could have been done, which we say there wasn't anything here, with respect to the city in particular, with respect to both of these things, you can't trace the injury to the advisory, right? Because doctors are finding, like, this information is undisputed, is based on information from the CDC and the medical literature of the nature that the AMA and the amici talk about. So it's hard to say that a single doctor's decision, right? They're not coming to the city. They're not coming to the state to get the medication. They're coming to a doctor. So there's nothing to say that what the city did with this policy is what's causing the injury. And the claims are, for similar reasons, are not redressable. What they're asking for is an order striking down the advisory. What they want is access to treatment without regard to race. But CDC guidance that says these things about concerning race would still be in place, as will extensive medical evidence, the medical evidence that the amici talk about. So I think for standing, it's just really impossible to show that this specific, in the case of the city, this specific document caused any injury to these plaintiffs, in particular, who just basically allege that they wish they had access to this medication. Thank you, Ms. Walsh. Take one minute, sir. Thank you, Your Honor. If I may, I'd like to make three quick points on rebuttal. First, the state tries to distinguish Bauer, but just read the facts of Bauer itself. There was no evidence of the disease in the United States in the past 13 years in Bauer, and they tested 6,500 animals, and there was no disease. And I think our chances of injury was much higher than the injury in Bauer. So second, the city's directive, you can find this on Joint Appendix 40, instructed providers to adhere to the state's directives, which instructed them to use race as a factor in allocating the treatments. I think that's enhanced risk that entitles us to retrospective relief under Bauer. And then third, New York makes a big deal about this is a decentralized process, but they made the exact opposite argument in the New York v. United States case decided by this court two years ago in which they relied on individuals disenrolling from public benefits. And the central inquiry of this court is- In that case, the government agency itself adopted the regulation in order to deter people from seeking the benefits, right? Just the same in this case, Your Honor. You also have the predictable effect on third parties because the state and the city argues before you today, and they have said in sworn declarations to the district court that these directives further a compelling interest in protecting public health. And it strains credibility to believe that they would have no effect if they wanted to do that. Thanks very much. Thank you. We'll reserve the decision, and we are adjourned. Court is adjourned.